1   Todd S. Kartchner (SBN 250215)
    Christopher Callahan (Pro Hac Vice forthcoming)
2   FENNEMORE CRAIG, P.C.
    2394 E. Camelback Road, Suite 600
3   Phoenix, Arizona  85016
    Phone: (602) 916-5000 / Fax: (602) 916-5999
4   tkartchner@fennemorelaw.com
    ccallahan@fennemorelaw.com
5
    Little Fawn Boland (SBN 240181)
6   CEIBA LEGAL, P.C.
    35 Miller Avenue, No. 143
7   Mill Valley, California  94941
    Phone: (415) 939-7797
8   littlefawn@ceibalegal.com

9   Keith Anderson (SBN 282975)
    KEITH ANDERSON, ATTORNEY AT LAW
10  35 Madrone Park Circle
    Mill Valley, California 94941
11  Phone: (401) 218-5401
    attorneykeithanderson@gmail.com
12
    Scott Crowell (Pro Hac Vice forthcoming)
13  CROWELL LAW OFFICE
    TRIBAL ADVOCACY GROUP LLP
14  1487 W. State Route 89A, Suite 8
    Sedona, Arizona 86336
15  Phone: (425) 802-5369
    scottcrowell@clotag.net
16
17  Attorneys for Plaintiff
    Coyote Valley Band of Pomo Indians

18
19                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
20

21  COYOTE VALLEY BAND OF POMO          Case No. 3:22-cv-605
    INDIANS, a federally recognized Indian tribe,
22                                       **VERIFIED COMPLAINT**
                   Plaintiff,
23
            v.
24
    ROBERT FINDLETON, doing business as
25  Terre Construction and On-Site Equipment;
    ANN C. MOORMAN, Judge of the Superior
26  Court of Mendocino County, California, in her
    official capacity,
27
                   Defendants.
28

Plaintiff Coyote Valley Band of Pomo Indians (the "Tribe"), a sovereign federally recognized Indian tribe, submits the following Complaint against Robert Findleton, in his individual capacity and as an individual doing business as Terre Construction and as On-Site Equipment ("Findleton"), and against Honorable Judge Ann C. Moorman, Judge of the Superior Court of Mendocino County, California, in her official capacity.

## THE PARTIES

1.      The Tribe is a federally recognized Indian tribe with a reservation located in Mendocino County, California (the "Coyote Valley Reservation").

2.      Findleton is a natural person who, upon information and belief, resides in Placer County, California.

3.      Ann C. Moorman is a natural person, who is a judge of the Superior Court of Mendocino County, California.

4.      At times material to the allegations in this Complaint, Findleton was doing business on the Coyote Valley Reservation, located in Mendocino County, as Terre Construction and On-Site Equipment Rental, and Ann C. Moorman, or judges before her, were presiding over the matter from the Superior Court of Mendocino County, California

## JURISDICTION AND VENUE

5.      The Court has personal jurisdiction over Findleton and Judge Moorman because their conduct giving rise to this dispute occurred in Mendocino County, California.

6.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362, *Coeur d'Alene Tribe v. Hawks*, 933 F.3d 1052 (9th Cir. 2019), and *Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*, __ F.4th __, 2022 WL 53421 (10th Cir. 2022).

7.      Venue is proper in the Northern District under 28 U.S.C. § 1391(b) because all events giving rise to this action occurred on the Coyote Valley Reservation located within Mendocino County, California.

. . .

**GENERAL ALLEGATIONS**

**The Tribe**

8.      As a federally recognized Indian tribe, the Tribe is entitled to the privileges and immunities of tribal sovereignty, including immunity from uncontested civil suit in California state court; the power to establish, operate, and maintain its own form of government and judicial system; and the power to regulate and exercise authority over non-Indians who have consented to the Tribe's authority by entering into a contractual relationship with the Tribe.

9.      The Tribe is organized under a constitution (the "Tribal Constitution") that divides the tribal government into three distinct branches: (i) a General Council consisting of all adult Tribal members; (ii) a Tribal Council consisting of seven Tribal members democratically elected by the General Council; and (iii) a Tribal Judiciary established by the Tribal Council.

10.     A true and correct copies of the Tribal Constitution and related documents are attached as Exhibit A and incorporated herein as though set forth in full.

11.     The Tribal Constitution vests the Tribal Council with authority to establish Tribal courts and determine their jurisdiction and procedures.

12.     Pursuant to Article XIV, Section 1 of the Tribal Constitution, tribal courts established by the Tribal Council "exercise jurisdiction over all cases and controversies within the [Tribe's] jurisdiction, in law and equity, whether civil or criminal in nature that arise under [the Tribal Constitution], the laws of the [Tribe], or which is vested in the tribal courts by federal law."

13.     With certain limited exceptions, Article VII, Section 1(n) of the Tribal Constitution vests the Tribal Council with legislative and lawmaking powers, including the power to "enact laws, statutes and codes governing conduct of individuals and proscribing offenses against the [Tribe]; to maintain order to protect the safety and welfare of all persons within tribal jurisdiction; and to provide for the enforcement of the laws and codes of the [Tribe]."

14.     Article V, Section 6(c)(6) of the Tribal Constitution further provides that "[n]o exercise of [the power to waive immunity] by the Tribal Council or by any other agency or officer of the [Tribe] shall be effective unless the General Council has given its consent to such action in

accordance with Article VII of [the Tribal Constitution]."

15.     Article VII of the Tribal Constitution reinforces this provision, stating that the Tribal Council "may assert as a defense to lawsuits against the [Tribe] the sovereign immunity of the [Tribe]; except that no waiver of sovereign immunity can be made by the Tribal Council without prior approval of the General Council."

16.     The Tribal Constitution states that "the General Council shall exercise its powers of self-government through the initiative, referendum, repeal and recall powers as set forth in Articles XI, XII, and XIII, of this [Tribal Constitution]."

17.     The Tribal Constitution also exclusively reserves to the General Council both "[t]he power to grant or relinquish any tribal jurisdiction to any other government, political subdivision of a government, agency, organization, association, or person" and "[t]he power to revoke, terminate or diminish a right reserved or delegated to the [Tribe] by federal law."

18.     The Coyote Valley Tribal Court (the "Tribal Court") is a member court of the Northern California Intertribal Court System ("NCICS").

**The AIA Agreement and Amendments**

19.     To help address poverty and high unemployment on the Tribe's reservation, in 2006 the Tribe retained Summit Project Management ("Summit") to manage and oversee construction of a casino on the Coyote Valley Reservation (the "Casino Project").

20.     Had the failed Casino Project been completed, it would have provided additional jobs for the Tribe's members and increased revenue to operate the Tribe's government and provide services to its members.

21.     At Summit's recommendation, on or about October 4, 2007, the Tribe and Findleton, who was doing business as Terre Construction, executed AIA Document A107–1997 (the "AIA Agreement"), under which Findleton agreed to perform construction services for the Tribe pertaining to the Casino Project.

22.     A true and correct copy of relevant excerpts of the AIA Agreement are attached as Exhibit B and incorporated herein as though set forth in full.

23.     As set forth on Page 1 of the AIA Agreement, Findleton agreed to perform the

following construction services on the Coyote Valley Reservation:

> Improvement/Widening of North State Street, relocation of a portion of the existing Bureau of Indian Affairs Road for the purpose of site preparation, and certain infrastructure improvements related to the [Tribe]'s construction of a new gaming facility and other ancillary work described in the Project Scope on pages 2 and 3 [of the AIA Agreement].

24.     By executing the AIA Agreement, Findleton agreed that the Tribe would retain sovereign immunity in all respects, that the Tribe's law would govern the AIA Agreement, and that Findleton would be subject to the Tribe's jurisdiction.

25.     Section 9.10.8 of the AIA Agreement states that "[n]o term or provision in th[e] Agreement shall be construed as a waiver of the sovereign immunity of the Coyote Valley Band of Pomo Indians."

26.     Section 9.10.8 further provides: "The Parties specifically agree that the sovereign immunity of the Coyote Valley Band of Pomo Indians shall not be waived for disputes or other matters related to th[e] Agreement."

27.     Section 18.1.2 of the AIA Agreement states that it "shall be governed by the law of the Coyote Valley Band of Pomo Indians" and that Findleton expressly "agrees to the jurisdiction of the Coyote Valley Band of Pomo Indians," and Findleton specifically agreed that state taxes did not apply to the assessment of a Tribal construction tax in Section 8.3.1(H), (J).

28.     On November 28, 2007 and January 31, 2008, Plaintiff and Findleton executed two amendments to the original AIA Agreement for additional construction services on the Coyote Valley Reservation. Those amendments are not directly pertinent to the issues before the Court.

29.     On August 19, 2008, Findleton sent a letter (the "Proposal Letter") to the Tribe in which Findleton proposed a third amendment to the AIA Agreement (the "Third Amendment"). A copy of the proposed Third Amendment was attached to the Proposal Letter.

30.     True and correct copies of the Proposal Letter and Third Amendment are attached as Exhibit C and incorporated herein as though set forth in full.

31.     As a condition to the Third Amendment, Findleton required the Tribe to "issue a tribal Resolution . . . includ[ing] the 'limited waiver of sovereign immunity' wording which

allows Terre Construction remedy within the U.S. Federal Court System."

32.     The Third Amendment further states that "[a]ll terms and conditions of the original [AIA Agreement] shall apply to this Amendment and to the additional work [it] describe[s]."

33.     The Parties agreed to and executed the Third Amendment on August 20, 2008.

34.     On August 27, 2008, the Tribal Council adopted Resolution No. CV-08-20-08-03 ("Resolution 08-03"), which accepts the terms and conditions set forth in the Proposal Letter, approves the scope of work the Proposal Letter outlines, and approves the Third Amendment.

35.     A true and correct copy of Resolution 08-03 is attached as Exhibit D and incorporated herein as though set forth in full.

36.     With respect to the Tribe's sovereign immunity, Resolution 08-03 states as follows:

> [The Tribe] hereby consents to a limited waiver of Sovereign Immunity of the Tribe, which is limited to 1.) provide for arbitration of disputes; 2.) avoid dispute resolution in state courts; 3.) limit recourse solely to casino assets; and 4.) shall not allow recourse to assets owned by individual members of the Tribe.

37.     By adopting Resolution 08-03, the Tribe did not waive sovereign immunity to civil suit in state court, including California's state courts.

### The Rental Agreement

38.     On or about November 7, 2007, the Tribe and Findleton, doing business as On-Site Equipment, executed a Master Rental Contract Rental Agreement (the "Rental Agreement") relating to leasing of construction equipment for use on the Coyote Valley Reservation.

39.     A true and correct copy of the Rental Agreement is attached as Exhibit E and incorporated herein as though set forth in full.

40.     Section 1 of the Rental Agreement states that Findleton will "deliver, store and lease equipment" to the Tribe at a "site within the Coyote Valley Indian Reservation," Section 22(E) states that the Agreement "shall be deemed to have been negotiated and executed within the Coyote Valley Indian Reservation," and Findleton agreed in Section 21 to the application of a Tribal tax and to the inapplicability of state sales tax.

41.     Section 22(D) of the Rental Agreement states that "[n]o term or provision in th[e]

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

Agreement shall be construed as a waiver of the sovereign immunity of the Coyote Valley Band of Pomo Indians."

42.     Section 22(D) further provides: "The Parties specifically agree that the sovereign immunity of [the] Coyote Valley Band of Pomo Indians shall not be waived for disputes or other matters related to th[e] Agreement."

43.     Section 20 of the Rental Agreement states that neither Findleton's nor the Tribe's rights "may be changed and no extension of the terms of th[e] [Agreement] may be made except in writing signed by both [Findleton] and [the Tribe]."

44.     Neither Findleton nor the Tribe executed any writing that changed the Tribe's rights or extended the terms of the Rental Agreement, and in State Court Findleton took the position that the AIA and Rental Agreements should be read together.

**Findleton's Failure to Comply with the Claims Ordinance**

45.     On February 22, 2008, after the Tribe was unable to secure permanent financing for the Casino Project, the Tribe suspended all operations on the Casino Project aside from project management.

46.     The Tribe subsequently notified Summit that it was terminating its contract on August 14, 2008, in part because of Findleton's defective construction work on the Casino Project that Findleton never remedied and Findleton's significant unapproved work to run up costs.

47.     Without following the procedures set forth in the Tribal Code, Findleton then demanded $926,195.76, which he alleged the Tribe owed him under the AIA Agreement and Rental Agreement.

48.     On January 31, 2011, the Tribe sent letters (the "Rejection Letters") notifying Findleton that his claims against the Tribe were barred by his failure to comply with the procedures set forth in Chapter 1.10 of the Tribal Code (the "Claims Ordinance"), which requires contract claims against the Tribe to be presented to the Tribal Council "not later than one hundred eighty (180) days after the accrual of the cause of action."

49.     True and correct copies of the Rejection Letters and Claims Ordinance are attached as, respectively, Exhibits F, G, and H and incorporated herein as though set forth in full.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

**The State Court Action and *Findleton I***

50.     On March 23, 2012, Findleton filed a Petition to Compel Mediation and Arbitration in the Superior Court of the State of California, County of Mendocino, Ukiah Branch (the "State Court").

51.     On October 31, 2013, the Tribe filed a Motion to Quash Service of the Summons and Motion to Dismiss for Lack of Subject Matter Jurisdiction with the State Court on the grounds that (1) the Tribe did not waive its sovereign immunity, (2) Findleton failed to exhaust tribal remedies, and (3) even if the tribe did waive its immunity, the State Court lacked jurisdiction.

52.     On May 19, 2014, the State Court granted the Tribe's Motion to Quash, finding "that there was no valid waiver of immunity and consent to jurisdiction."

53.     Findleton appealed the State Court's decision (*Findleton I*), and on July 29, 2016, the Court of Appeal for the State of California (the "Appellate Court") reversed and held that "the Tribal Council was authorized to, and did, waive the Tribe's sovereign immunity for purposes of arbitrating disputes arising under the Tribe's contracts with Findleton."

54.     Following the Appellate Court decision, Findleton filed a second Motion to Compel Mediation and Arbitration on October 4, 2016.

55.     On November 18, 2016, the Tribe filed a Notice of Demurrer and Demurrer to Complaint, arguing that the purported waiver of sovereign immunity did not confer jurisdiction to the State Courts because the Tribal Court—not the State Court—must determine the arbitrability of the claim and whether Findleton exhausted Tribal remedies.

56.     On February 1, 2017, the State Court overruled the Tribe's demurrer, holding that "[a] Tribe's sovereignty remains intact and suit in state court is barred unless, and until, as here, the Tribe waives its sovereignty with respect to the dispute and, in effect, consents to state jurisdiction."

57.     On April 24, 2017, the State Court issued an order (the "Order Compelling Mediation") finding that "[t]here is nothing about [the State Court suit] that impinges on tribal sovereignty," that "[w]hen a tribe waives its sovereign immunity it, in effect, consents to state

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

court jurisdiction," and that the Tribe consented to state court jurisdiction and waived sovereign immunity "when it agreed to arbitrate its disputes with Findleton." The Order Compelling Mediation further provides that "[t]he parties are ordered to mediation."

58.     Neither the State Court nor the Appellate Court addressed the Tribe's arguments that the State Court lacks subject-matter jurisdiction, regardless of the purported waiver of sovereign immunity.

59.     A true and correct copy of the Order Compelling Mediation is attached as Exhibit I and incorporated herein as though set forth in full.

<strong>The First Tribal Court Permanent Injunction</strong>

60.     On January 20, 2017, before the State Court made any substantive jurisdictional determinations, the Tribe filed a Petition for Tribal Court Review (the "Petition") in the Tribal Court.

61.     On January 26, 2017, the Tribal Court granted the Tribe's Petition, concluding that the Tribe had made "a colorable claim that [it] ha[d] both subject matter jurisdiction over the dispute, and personal jurisdiction over [Findleton]."

62.     A true and correct copy of the Amended Memorandum Decision explaining the Tribal Court's decision to grant the Petition is attached as Exhibit J and incorporated herein as though set forth in full.

63.     Findleton subsequently filed a Motion to Dismiss for Lack of Jurisdiction, which the Tribal Court denied on March 27, 2017.

64.     A true and correct copy of the Tribal Court's order denying the Motion is attached as Exhibit K and incorporated herein as though set forth in full.

65.     On July 6, 2017, the Tribal Court issued its opinion on the Tribe's Petition (the "Petition Opinion").

66.     A true and correct copy of the Petition Opinion is attached as Exhibit L and incorporated herein as though set forth in full.

67.     In the Petition Opinion, the Tribal Court concluded that the State Court lacks jurisdiction:

It is abundantly clear from the various Agreements that the state court was not to have jurisdiction.  Given the complete lack of either jurisdiction or choice of law granted to the state of California, the reservation of choice of law and jurisdiction to the Tribe, as well as the express statement that the Tribe wished to avoid state courts, there is no support for finding that the state had jurisdiction in this matter.  Nor is there anything else in the record to suggest that the parties agreed to state court jurisdiction in the event of a dispute.  Instead, the Tribe clearly stated that it did not want state jurisdiction.

68.     Moreover, even though Findleton expressly agreed to be subject to the Tribe's jurisdiction, in Footnote 3 of the Petition Opinion the Tribal Court observed that Findleton failed to cooperate with Tribal Court proceedings, including by failing to "follow court orders" and "communicate in any way with the court or its staff."

69.     On August 17, 2017, the American Arbitration Association ("AAA") sent a letter to the parties notifying them that, at Findleton's request, AAA would proceed with mediation and arbitration pursuant to the State Court's Order Compelling Mediation.

70.     On August 22, 2017, the Tribe sent a letter to AAA seeking dismissal of the mediation and arbitration and attaching a copy of the Tribal Court's Petition Opinion.

71.     On August 29, 2017, AAA responded that it would proceed with arbitration based on the AIA Agreement and Rental Agreement and the absence of an order from the Tribal Court staying the State Court proceedings.

72.     On September 15, 2017 the Tribe filed a Motion for Temporary Restraining Order and Preliminary Injunction in Tribal Court seeking to restrain Findleton and AAA from proceeding with mediation and arbitration.

73.     On October 2, 2017, following a hearing in which AAA and the Tribe participated and in which Findleton did not appear, the Tribal Court granted a temporary restraining order enjoining AAA and Findleton from proceeding with mediation or arbitration (the "Tribal Court Preliminary Injunction").

74.     A true and correct copy of the Tribal Court Preliminary Injunction is attached as Exhibit M and incorporated herein as though set forth in full.

75.     On October 27, 2017, after providing both parties with an opportunity to be heard, AAA sent a letter (the "Notice of Stay") notifying the Tribe and Findleton that mediation and

arbitration proceedings were stayed in accordance with the Tribal Court Preliminary Injunction.

76.     A true and correct copy of the Notice of Stay is attached as Exhibit N and incorporated herein as though set forth in full.

77.     On October 2, 2017, October 30, 2017, November 27, 2017, and December 14, 2017, the Tribal Court held hearings relating to the Tribe's request for injunctive relief.  Although the Tribe and AAA participated in these hearings, Findleton again declined to appear or to participate in any of these hearings and was sanctioned by the Tribal Court as a result.

78.     On December 20, 2017, the Tribal Court issued an order permanently enjoining AAA and Findleton from initiating arbitration or otherwise enforcing the arbitration clause contained in the AIA Agreement and Rental Agreement (the "First Tribal Court Permanent Injunction").

79.     A true and correct copy of the First Tribal Court Permanent Injunction is attached as Exhibit O and incorporated herein as though set forth in full.

80.     On April 23, 2018, AAA sent a letter (the "Notice of Closure") to the parties confirming receipt of the First Tribal Court Permanent Injunction and informing the parties that the matter is closed.

81.     A true and correct copy of the Notice of Closure is attached as Exhibit P and incorporated herein as though set forth in full.

**The Enforcement of Judgments Ordinance and the Sanctions Orders**

82.     On December 14, 2017, the Tribal Council enacted Ordinance No. CV-TC-12-14-17-01 (the "Enforcement of Judgments Ordinance").

83.     A true and correct copy of the Enforcement of Judgments Ordinance is attached as Exhibit Q and incorporated herein as though set forth in full.

84.     The Enforcement of Judgments Ordinance establishes the exclusive procedure for collection of a debt by a judgment creditor against persons under the Tribe's jurisdiction or against the Tribe. It requires that a final judgment must first be obtained against the person who owes the debt. If the judgment is a foreign judgment, it must be domesticated by the Tribal Court prior to enforcement.

85.     In direct violation of the First Tribal Court Permanent Injunction and the procedures prescribed by the Enforcement of Judgments Ordinance, on June 27, 2018, Findleton filed a motion in State Court for sanctions against the Tribe for failing to attend mediation and arbitration.

86.     On December 10, 2018, the State Court granted Findleton's motion, impugned the Tribal Court proceedings as "intended for the purpose of negating th[e] [State Court's] order," and ordered the Tribe to pay Findleton $86,457 in sanctions (the "First Sanctions Order").

87.     A true and correct copy of the First Sanctions Order is attached as Exhibit R and incorporated herein as though set forth in full.

88.     The Tribe appealed the First Sanctions order on February 6, 2019.

89.     The State Court issued an additional sanction (the "Second Sanctions Order") for $11,348 on January 2, 2020 after granting a motion to compel discovery filed by Findleton (the "Order Compelling Discovery").

90.     A true and correct copy of the Second Sanctions Order is attached as Exhibit S and incorporated herein as though set forth in full.

91.     The Tribe appealed the Second Sanctions Order on March 6, 2020.

### *Findleton II* and Findleton's Subsequent Request to AAA

92.     In the interim, on remand after the Appellate Court's ruling in *Findleton I*, Findleton filed a motion in State Court for an award of the contractual attorneys' fees he had incurred in the prior appellate proceedings.

93.     The State Court granted Findleton's motion for fees, and the Tribe appealed.

94.     In a September 25, 2018 ruling (*Findleton II*), the Appellate Court interpreted the waiver of sovereign immunity found in *Findleton I* to extend to the Rental Agreement, and therefore found that Findleton was entitled to attorneys' fees.

95.     Pursuant to a written request by Findleton based on the holdings of *Findleton II*, he requested the AAA consider opening the case on February 5, 2019.

96.     The parties each submitted briefs per the AAA's invitation.

97.     In a February 25, 2019 letter, the AAA informed the parties that it had decided to

keep the matter closed.

**The Second Tribal Court Permanent Injunction**

98.     On February 7, 2019, the Tribe filed a Motion for Declaratory Judgment, Temporary Restraining Order, Preliminary Injunction and Permanent Injunction with the Tribal Court.

99.     Among other things, the Tribe sought a declaratory judgment that the Enforcement of Judgments Ordinance was the exclusive means by which Findleton could enforce State Court monetary judgments against the Tribe's assets and an injunction requiring that any foreign monetary judgments obtained by Findleton be domesticated in the Tribal Court pursuant to the Enforcement of Judgments Ordinance as part of the debt collection process.

100.    The Tribe further requested that the Tribal Court enjoin Findleton, those in active concert or participation with him, and any officers, staff, and representatives of the Tribe from engaging in judgment collection proceedings in State Court, including participation in a debtor's examination.

101.    On March 18, 2019, after giving advance notice to all parties, the Tribal Court held a hearing on the Tribe's request for a preliminary and permanent injunction. Again, Findleton failed to appear or to participate in any way in the hearing.

102.    On April 6, 2019, the Tribal Court granted the Tribe's motion and entered an order consistent with the relief the Tribe requested (the "Second Tribal Court Permanent Injunction").

103.    A true and correct copy of the Second Tribal Court Permanent Injunction is attached as Exhibit T and incorporated herein as though set forth in full.

104.    Pursuant to the Second Tribal Court Permanent Injunction, "Findleton and all those in active concert or participation with him and any individual including officers, staff and representatives of the Tribe, are permanently restrained and enjoined from engaging in judgment collection proceedings in the State Court (including conducting a debtor's examination) against the Tribe's property."

105.    The Second Tribal Court Permanent Injunction further provides that "Findleton is permanently enjoined from taking any action to perfect a lien, levy, or garnishment of the Tribe's

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

personal property, or engage in any other action to collect any Foreign Judgment, without first moving to domesticate such judgment in the Tribal Court pursuant to Article 5, § 01, *et seq.* of the Coyote Valley Enforcement of Judgments Ordinance."

**The State Court Orders and *Findleton III***

106.    The Coyote Valley Casino (the "Casino") and all of its assets are owned by the Coyote Valley Entertainment Enterprises ("CVEE"), a tribally chartered subdivision of the Coyote Economic Development Corporation ("CEDCO"), a federally chartered corporation.

107.    Both CVEE and CEDCO are cloaked in the privileges and immunities of tribal sovereignty, including sovereign immunity from unconsented suit.

108.    On November 16, 2017, the Tribe transferred all Casino assets and liabilities to CVEE to comply with certain lender and investor requirements in association with the federal government's New Markets Tax Credit Program.

109.    The transfer of Casino assets and liabilities was a condition of the lender and investor to comply with the federal requirements of the New Markets Tax Credit Program.

110.    On January 11, 2018, Findleton submitted an application in State Court for a debtor's examination.

111.    In response, the Tribe asked the State Court to clarify that the collection of money judgments could only be enforced against Casino assets due to the language in the waiver and acknowledge that the Tribe did not possess any Casino assets.

112.    On April 26, 2019, the State Court issued an order finding that the phrase "Casino assets" did not need any clarification.

113.    In direct violation of the Second Tribal Court Permanent Injunction, on February 27, 2019 Findleton filed a motion in State Court for an order requiring the Tribe to post an undertaking to stay execution of the order awarding sanctions and directing issuance of a writ of execution.

114.    The State Court granted Findleton's request for the undertaking on April 29, 2019, adding a finding that the Tribe's Casino assets had been conveyed fraudulently or inequitably to CVEE and that the transfer was set aside for purposes of the case without any notice, hearing, or

due process to the Tribe, CEDCO, or CVEE regarding the topic.

115.    In the interim, Findleton made several indications through counsel that he intended to file suit in federal court. For example, on May 24, 2019, Findleton's counsel indicated at an ex parte hearing that "since mid-March we have been planning a federal court action to enjoin the judge of the Tribal Court . . . from improperly exercising tribal court jurisdiction over a non-Indian, nonmember individual." A true and correct copy of the relevant portion of the transcript from that hearing is attached as Exhibit U and incorporated herein as though set forth in full.

116.    In a notice of intent sent to the Tribe, a true and correct copy of which is attached as Exhibit V, Findleton even indicated that he intended to file suit in federal court.

117.    On June 19, 2020, the Tribe filed three appeals under case numbers A158171, A158172 and A158173, which were consolidated (the "Debt Collection Consolidated Appeals").

118.    The Appellate Court considered the Debt Collection Consolidated Appeals together with two appeals from the First (A156459) and Second Sanctions Orders (A159823).

119.    In a September 29, 2021 opinion (*Findleton III*), the Appellate Court invoked the disentitlement doctrine against the Tribe for accessing the Tribal Court and dismissed all five of the Tribe's pending appeals subject to reinstatement on the condition that the Tribe "complies with the superior court's orders compelling mediation and arbitration, imposing monetary sanctions and awarding prevailing party fees to Findleton within 90 days." *Findleton v. Coyote Valley Band of Pomo Indians (Findleton III)*, 285 Cal. Rptr. 3d 47 (App. 2021).

120.    The Tribe was given until January 31, 2022 to comply with *Findleton III*.

**Pending and Forthcoming State Court Filings and Proceedings**

121.    On January 7, 2022 the State Court issued a Notice to Appear and Produce Documents in Lieu of Subpoena at Debtor's Examination to Tribal Council Chairman Michael Hunter; Vice-Chairman Richard Campbell Jr.; Tribal Historian Margaret Olea; and Tribal Treasurer Amanda Pulawa (the "Notice to Appear").

122.    A true and correct copy of the Notice to Appear is attached as Exhibit W and incorporated herein as though set forth in full.

123.    These debtor's examinations are scheduled for February 25, 2022.

124.    The State Court by way of a Case Management Order recently calendared hearings for contempt sanctions for violating the Order Compelling Discovery and contempt sanctions for violating the Order Compelling Mediation. A true and correct copy of the Case Management Order is attached as Exhibit X and incorporated herein as though set forth in full.

125.    These hearings are scheduled for February 18, 2022 and March 25, 2022, respectively.

126.    Findleton is seeking $2,940,000 in contempt sanctions for violating the Order Compelling Discovery against the Tribe and the Tribe's counsel.

127.    Findleton has not indicated yet what the amount of contempt sanctions for violating the Order Compelling Mediation will be.

128.    On January 13, 2022, Savings Bank of Mendocino County sent the Tribe five Notices of Garnishment, along with a Notice of Judgment Lien that was filed in the State Court on January 6, 2022. It stated that it intended to debit the Tribe's bank accounts on January 22, 2022.

129.    True and correct copies of the Notices of Garnishment and Notice of Judgment Lien are attached as Exhibits Y and Z and incorporated herein as though set forth in full.

130.    Out of an abundance of caution and while preserving the Tribe's objection to the State Court's jurisdiction, on January 25, 2022, the Tribe attended an ex parte hearing in the State Court seeking a stay of the execution of the writs of execution.

131.    The State Court denied the Tribe's stay application on January 28, 2022.

132.    During the ex parte, hearing both Findleton and the State Court rejected a proposal from the Tribe to place the funds with a third-party escrow agent for the duration of this action.

133.    The next day, on January 26, 2022, the Tribe sent a proposal to Findleton addressing the concerns raised during the hearing.

134.    A second ex parte hearing was then scheduled for January 31, 2022, at which the Tribe will be requesting that the State Court and Findleton discuss its proposal.

. . .

**COUNT ONE**

**Recognition and Enforcement of First Tribal Court Permanent Injunction**

135.    The Tribe incorporates by reference all allegations in the preceding Paragraphs of this Complaint.

136.    By executing the AIA Agreement, Findleton expressly agreed to be subject to the Tribe's jurisdiction.

137.    The Tribal Court therefore has personal jurisdiction over Findleton.

138.    As Findleton acknowledged in the Petition to Compel, a true and correct copy of which is attached hereto as Exhibit AA, The AIA Agreement, amendments thereto, and Rental Agreement (collectively, the "Agreement Documents") were negotiated and entered into on the Coyote Valley Reservation, pertain to work to be performed on the Coyote Valley Reservation, and are expressly governed by the Tribe's laws.

139.    The Tribal Court therefore has jurisdiction over the subject matter of any dispute arising out of the Agreement Documents.

140.    In contrast, the Tribe did not consent to the State Court exercising subject matter jurisdiction over any such dispute, and Congress did not grant the State Court subject matter jurisdiction over the same.

141.    The Tribe did not waive and expressly retained sovereign immunity with regard to suit commenced in any state court.

142.    The State Court therefore does not have subject matter jurisdiction over any dispute arising out of the Agreement Documents.

143.    The Tribal Court afforded Findleton due process in connection with the First Tribal Court Permanent Injunction.

144.    There are no equitable grounds upon which this Court may decline to recognize and enforce the First Tribal Court Permanent Injunction.

145.    The First Tribal Court Permanent Injunction is a final and enforceable judgment that is entitled to recognition and enforcement under principles of comity.

. . .

**COUNT TWO**

**Recognition and Enforcement the Second Tribal Court Permanent Injunction**

146.    The Tribe incorporates by reference all allegations in the preceding Paragraphs of this Complaint.

147.    The Tribal Court has personal jurisdiction over Findleton and subject matter jurisdiction over any dispute arising out of the Agreement Documents, including the dispute giving rise to the Second Tribal Court Permanent Injunction.

148.    The State Court lacks subject matter jurisdiction over any dispute arising out of the Agreement Documents, including the dispute giving rise to the Second Tribal Court Permanent Injunction.

149.    The Tribal Court afforded Findleton due process in connection with the Second Tribal Court Permanent Injunction.

150.    There are no equitable grounds upon which this Court may decline to recognize and enforce the Second Tribal Court Permanent Injunction.

151.    The Second Tribal Court Permanent Injunction is a final and enforceable judgment that is entitled to recognition and enforcement under principles of comity.

**COUNT THREE**

**Recognition and Enforcement of the Tribal Court Sanctions Orders**

152.    The Tribe incorporates by reference all allegations in the preceding Paragraphs of the Complaint.

153.    The Tribal Court has personal jurisdiction over Findleton and subject matter jurisdiction over any dispute arising out of or relating to the Agreement Documents, including the dispute giving rise to the Tribal Court Sanctions Orders.

154.    The State Court lacks subject matter jurisdiction over any dispute arising out of the Agreement Documents, including the dispute giving rise to the Tribal Court Sanctions Orders.

155.    The Tribal Court afforded Findleton due process in connection with the Tribal Court Sanctions Orders.

156.    There are no equitable grounds upon which this Court may decline to recognize

1    and enforce the Tribal Court Sanctions Orders.

2         157.    The Tribal Court Sanctions Orders are final and enforceable judgments that are

3    entitled to recognition and enforcement under principles of comity.

4                                    **COUNT FOUR**

5               **Declaratory Judgment that the State Court Lacks Jurisdiction**

6         158.    The Tribe incorporates by reference all allegations in the preceding Paragraphs of

7    the Complaint.

8         159.    The Tribal Court has exclusive subject-matter jurisdiction over any dispute arising

9    out of the Agreement Documents, including the dispute giving rise to the Tribal Court Orders.

10        160.    The State Court therefore lacks subject matter jurisdiction over any dispute arising

11   out of the Agreement Documents, including the dispute giving rise to the First Tribal Court

12   Permanent Injunction, Second Tribal Court Permanent Injunction, and Tribal Court Sanctions

13   Orders (collectively, the "Tribal Court Orders").

14        WHEREFORE, the Tribe prays for the following relief:

15        1.      Recognition and enforcement of the First Tribal Court Permanent Injunction;

16        2.      Recognition and enforcement of the Second Tribal Court Permanent Injunction;

17        3.      Recognition and enforcement of the Tribal Court Sanctions Orders;

18        4.      Declaratory judgment that the State Court lacks jurisdiction over the dispute giving

19   rise to the Tribal Court Orders;

20        5.      An order permanently enjoining Findleton from violating the First Tribal Court

21   Permanent Injunction;

22        6.      An order permanently enjoining Findleton from violating the Second Tribal Court

23   Permanent Injunction; and

24        7.      Any and all other relief the Court may deem proper.

25   . . .

26

27

28

DATED this 29th day of January, 2022.

CEIBA LEGAL, PC

By: _____
Little Fawn Boland (SBN 240181)

KEITH ANDERSON, ATTORNEY AT LAW
Keith Anderson (SBN 282975)

FENNEMORE CRAIG, P.C.
Todd S. Kartchner (SBN 250215)
Christopher Callahan (*Pro Hac Vice* forthcoming)

CROWELL LAW OFFICE
TRIBAL ADVOCACY GROUP LLP
Scott Crowell (*Pro Hac Vice* forthcoming)

*Attorneys for Plaintiff*
*Coyote Valley Band of Pomo Indians*

1

## **VERIFICATION**

2    I, Michael Hunter, am Chairman of the Coyote Valley Band of Pomo Indians (the

3  "Tribe").  I am over 18 years of age, am authorized to execute this Verification on the

4  Tribe's behalf, and either have personal knowledge of, or have conducted a reasonable

5  inquiry to familiarize myself with, the facts stated in the Verified Complaint to which this

6  Verification is attached.  I have read the Verified Complaint and declare under penalty of

7  perjury that the facts stated therein are true and correct to the best of my knowledge,

8  information, and belief.

9    DATED January 29, 2022

10

11    _____

    Michael Hunter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28